# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 16, 2014

## STATE OF TENNESSEE v. JAMESON DELGIZZI, aka DECHARME

**Appeal from the Circuit Court for Hickman County**
No. 12-5025CR      Timothy L. Easter, Judge

**No. M2013-02864-CCA-R3-CD - Filed October 15, 2014**

The defendant, Jameson Delgizzi, also known as Decharme, pled no-contest to attempted aggravated sexual battery, a Class C felony, and agreed to be sentenced outside his range, as a Range III offender, with the sentence and manner of service to be determined by the trial court. Following a sentencing hearing, the defendant received a sentence of eleven years in the Department of Correction. On appeal, he argues that an eleven-year term is excessive and that he should have been granted probation or split confinement. After review, we affirm the sentencing decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and NORMA MCGEE OGLE, J., joined.

Richard Boehms, Duck River, Tennessee, for the appellant, Jameson Delgizzi, aka Decharme.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Kim R. Helper, District Attorney General; and L. Kate Yeager, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant was indicted for rape of a child, as a result of his, at the age of eighteen, receiving oral sex from a three-year-old relative whom he was babysitting. At the guilty plea hearing, the State relayed that, had the case gone to trial, its proof would have shown that the defendant asked the victim to play the "lollipop game" with him, wherein she

put his penis inside her mouth. The defendant gave a statement to police admitting to the crime.

The trial court reviewed the defendant's rights with him, as well as the consequences of his plea agreement, including the requirement of community supervision for life. The court ensured that the defendant was aware that he was pleading outside his range. It was explained that such agreement was reached to "get it to a number of years that makes it able for everybody to agree on a sentence[.]" The defendant asserted to the trial court that if he were drug-tested, he would not test positive. However, the defendant was immediately drug-tested and returned a positive result, which prompted the court to comment, "You've already misled the Court. That's not a good start."

The court conducted a sentencing hearing at which M'Lee Hudgins, a forensic interviewer with the Child Advocacy Center, testified that she interviewed the victim who was almost four years old. Hudgins recalled that the victim related what had happened:

[S]he pointed to the penis on the male anatomical drawing and told me that was a penis and that she saw daddy's penis. She then said I touched it and see what it would look like. [The victim] said that [the defendant]'s penis looks like a lollipop, said [the defendant] is my brother. [The victim] said I keep putting it in my mouth. [The victim] said her mouth, it bite it. [The victim] said pee pee came out of [the defendant]'s penis. [The victim] said it taste like a lollipop sucker. [The victim] said [the defendant]'s penis looked big and big and way big. [The victim] said [the defendant]'s penis was hard.

Hudgins described the victim's demeanor as "[v]ery happy and very talkative, she was very verbal, just a happy little girl."

Scott Smith, Chief Deputy at the Hickman County Sheriff's Department, testified that he interviewed the defendant in response to the victim's disclosure. During the interview, the defendant admitted to having the three-year-old victim perform oral sex, or play "the lollipop game," on him. Deputy Smith believed that the defendant was the victim's uncle.

The victim's father testified that the defendant was his wife's uncle's son or her cousin. On the night of the incident, the victim's father and his wife asked the defendant to babysit the victim. They put the victim to bed and were gone two to three hours. When they returned, the victim was in a different bed, dressed in different clothes, and had no underwear on. Both the victim and the defendant said that the victim had wet the bed.

The victim's father testified that the victim came to him the next morning and said, "Uncle Jay put his penis in my mouth, it was funny, huh." The victim's father initially "had a hard time believing that actually occurred" and thought the victim might have dreamed it. The victim's father explained that they were not shy about nudity in the home, and his wife had recently had an adult party for women featuring penis-shaped pencil toppers that he thought the victim might have found lying around the house. However, the victim was adamant that the penis she was talking about was "on him," referring to the defendant.

The victim's father testified that, since the incident, the victim was immediately more aware of adult situations and understood sexual innuendo jokes that she previously did not understand. The victim's father said that they had been "ostracized" by his wife's family since the incident, which prevented his wife from visiting her dying grandmother. The victim's father said that he wanted to "see justice happen" so that the defendant would not "be able to do this to anyone else."

The victim's mother testified similarly to the victim's father. The victim's mother stated that at first she explored other possible explanations for what the victim had described because she did not want to believe the defendant had done what the victim said. The victim's mother said that she did not think there would be any problem in leaving the victim in the defendant's care, explaining that she had taken the defendant along on a road trip to Maine with the victim without any issue. She trusted the defendant to take care of the victim.

The victim's mother said that her side of the family would not associate with her after the incident. She stated that the victim now "assumes that she's alone in the world" and did not even expect to have anyone at her birthday party. The victim's mother relayed that at one point, they lived in a tent on family property and no one in the family checked on them. Another time, a vehicle belonging to one of her uncles spun its wheels to spray gravel on her. Asked what she wanted to see happen, the victim's mother said that she wanted to see the defendant get help and not hurt anyone else.

The victim's mother testified that the only contact she had had with the defendant since the incident was at her grandmother's funeral when he asked for payment for babysitting. She said that it would have been better for a stranger to have been the perpetrator because the defendant's actions caused the family to choose sides and denied her the support that she needed. The victim's mother said that she was "breaking down over all of this" and having "some invasive thoughts," causing her to spend some time in the hospital. She said that she had been waiting for two years to get closure.

The victim testified that the defendant "did something bad" and "put his penis in . . . [her] mouth instead of giving [her] a lollipop to play a lollipop game."

The defendant called two witnesses at the hearing. The defendant's biological father, Donald Ducharme, testified that the defendant was adopted by his mother's husband approximately ten years ago and had lived in Rhode Island with his mother until three years ago. However, the defendant presently lived in Tennessee with Ducharme, Ducharme's wife, and Ducharme's other twenty-year-old son. Ducharme believed that the defendant did not go beyond the eighth grade in school. Ducharme said that the defendant had tried unsuccessfully to get a job but had an interview at Walmart the following day. Ducharme stated that the defendant would continue to live with him if afforded probation and that he would keep a close eye on the defendant to make sure he abided by all the requirements of probation. Ducharme recalled that the victim's mother had been to his house a couple of times since the incident but admitted that it was fair to say no one on his side of the family had much contact with her.

Susan Siedentop testified that she would be the defendant's parole officer if the defendant was granted probation. Siedentop met with the defendant several times and prepared his presentence report. She noted that the defendant was always compliant and prompt. Based on her interview of the defendant and visit to his home, she believed the defendant was willing to comply with the rules of probation, which included drug and alcohol treatment, as well as sex offender treatment. She thought the defendant could possibly get his GED.

Siedentop testified that the defendant gave a written statement of his version of the events of the offense in which he said that he did not remember what happened because he "was high and drunk[.]" Siedentop said that she reviewed the defendant's psycho-sexual report prior to completing the presentence report.

The victim's mother was recalled as a witness and testified that the defendant did not appear to be under the influence of drugs or alcohol either before they left or when they returned home on the night of the incident.

After the hearing, the trial court imposed a sentence of eleven years in the Department of Correction. This appeal followed.

## ANALYSIS

The defendant argues that the trial court should have sentenced him to ten, rather than eleven, years because there was only one enhancement factor and several mitigating factors which should have applied. He additionally argues that "if th[is] [c]ourt agrees with his argument regarding the length of the sentence (that it be 10 years), he would be eligible for probation."

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707. This standard of review also applies to "questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012).

Under the revised Tennessee sentencing statutes, a defendant is no longer presumed to be a favorable candidate for alternative sentencing. State v. Carter, 254 S.W.3d 335, 347 (Tenn. 2008) (citing Tenn. Code Ann. § 40-35-102(6)). Instead, the "advisory" sentencing guidelines provide that a defendant "who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann.

§ 40-35-102(6).

A defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed on the defendant is ten years or less. Tenn. Code Ann. § 40-35-303(a). A defendant is not, however, automatically entitled to probation as a matter of law. The burden is upon the defendant to show that he is a suitable candidate for probation. Id. § 40-35-303(b); State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In order to meet this burden, the defendant "must demonstrate that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995) (quoting State v. Dykes, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)).

There is no bright line rule for determining when a defendant should be granted probation. Bingham, 910 S.W.2d at 456. Every sentencing decision necessarily requires a case-by-case analysis. Id. Factors to be considered include the circumstances surrounding the offense, the defendant's criminal record, the defendant's social history and present condition, the need for deterrence, and the best interest of the defendant and the public. Goode, 956 S.W.2d at 527. Also relevant is whether a sentence of probation would unduly depreciate the seriousness of the offense. See State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997); Bingham, 910 S.W.2d at 456.

In State v. Hooper, 29 S.W.3d 1, 10 (Tenn. 2000), our supreme court outlined a non-exhaustive list of factors for determining whether a need for deterrence is present and whether incarceration is "particularly suited" to achieve that goal. These factors include:

(1) Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole;

(2) Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior;

(3) Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case;

(4) Whether the defendant was a member of a criminal enterprise, or substantially encouraged or assisted others in achieving the criminal objective; and

(5) whether the defendant has previously engaged in criminal conduct of the

same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions.

Id. at 10-12.

In determining if incarceration is appropriate in a given case, a trial court should consider whether:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). Furthermore, the defendant's potential for rehabilitation or lack thereof should be examined when determining whether an alternative sentence is appropriate. Id. § 40-35-103(5).

In determining the defendant's sentence, the court noted its consideration of the entire record, the defendant's presentence report, the evidence presented at the sentencing hearing, the principles of sentencing, the nature and characteristics of the criminal conduct, the arguments of counsel, and the enhancement and mitigating factors. As to enhancement factors, the court found that the defendant abused a position of private trust, in that he was a family member of the victim. Tenn. Code Ann. § 40-35-114(14). As for mitigating factors, the court acknowledged that the defendant's conduct did not cause or threaten serious bodily injury, and he did not have a criminal record. Id. § 40-35-113(1), (13). The trial court specifically addressed the defendant's psycho-sexual report prepared by Dr. Montgomery. As to the report, the court noted:

The Court finds that it is significant in reviewing Dr. Montgomery's report that [the defendant's] results on the probability values test indicates that the probability that his response pattern matches that of a child abuser who attempts to conceal their deviant sexual interest.

The [d]efendant's ranking was in the higher risk category on the visual reaction timing questionnaire that was administered to him by Dr.

Montgomery.

Further more, Dr. Montgomery in his conclusion found that the [d]efendant's overall risk level for engaging in future sexual offenses against children or non[-]consenting adults as a medium potential category when given the options of low, medium, or high. That's troubling to the Court that he would fall into that category.

Certainly, it's some level of comfort that he wouldn't be high, but he does fall into the medium category. And as stated by the doctor, this is due to his young age and lack of long-term cohabitation with intimate partners, lack of substance, abuse, or unstable living and support network, has poor academic achievement, limited occupation opportunities. And these allegations themselves, which are no longer allegations, they are facts, this young man intentionally committed a shocking act on a three-year-old child.

The court concluded that a sentence of eleven years in the Department of Correction was the appropriate sentence for the defendant, which the court felt was "no greater than deserved for the offense committed[.]" The court noted that a sentence of more than ten years rendered the defendant ineligible for probation but that, regardless, the circumstances of the offense were so "reprehensible, offensive, and shocking to the extent that denial o[f] alternative sentencing in any form [wa]s appropriate." The court, again, noted that it considered "the nature and circumstances of this offense, the [d]efendant's criminal record, which is lacking, [and] his background, his social history, which weighs against him." The court additionally observed that

this type of conduct cannot be tolerated by a society in such a way that there would be some type of approval of this kind of conduct in any way. So the deterrent effect on the [d]efendant as well as society is warranted in this case and a finding that the interest of the public would not be served in granting a probational sentence.

The defendant asserts that the imposition of an eleven-year sentence was in error because he was entitled to more mitigation based on his youth and maturity level, and because neither the victim nor her mother ever testified specifically that they wished to see him incarcerated. However, the record reflects that the trial court imposed the sentence after proper consideration of all the evidence and testimony, the purposes and principles of our sentencing act, and consideration of the enhancement and mitigating factors. See Bise, 380 S.W.3d at 706. In light of the presumption of correctness attendant to the trial court's findings, we discern no abuse of discretion in the trial court's imposition of a term of eleven

years.

Additionally, because the defendant was sentenced to a term of eleven years and the sentence is affirmed, the defendant is not eligible for probation. See id. § 40-35-303(a) (providing that a defendant shall be eligible for probation, subject to certain exceptions, if the sentence imposed is ten years or less). Therefore, the trial court did not abuse its discretion in imposing a sentence of confinement. Moreover, even if the defendant were eligible for probation, the trial court would have been well within its discretion to deny the defendant an alternative sentence to avoid depreciating the seriousness of the offense.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the sentencing decision of the trial court.

_____
ALAN E. GLENN, JUDGE